IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 19-78 |
| | : | |
| DARIUS CARTER | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**                                                     **November 26, 2019**

Defendant Darius Carter is accused of robbing two cell phone stores. He moves to suppress evidence the police collected as a result of his allegedly unconstitutional arrest. He also argues police violated his right against self-incrimination under *Miranda* and his due process rights by using a suggestive photo array. Because none of Carter's rights were violated, the Court denies Carter's motion to suppress.

**BACKGROUND**

On October 18, 2018, two men robbed a Boost Mobile store in North Philadelphia. A police bulletin described one of the robbers as a black man in his twenties who was approximately five feet nine inches tall. Gov't Hr'g Ex. 5 at 1. The bulletin also said this robber was wearing "black pants with stripes on the side, [a] dark navy blue hoody, black sneakers, gloves, [a] mask, [and a] blue school book bag." *Id.* The bulletin explained this robber was carrying a black semi-automatic handgun. *Id.* In addition, the bulletin noted both robbers fled west then north after committing the robbery. *Id.*; *see also* Gov't Ex. 1 (map of the area). After the robbery, police recovered security video from inside the Boost Mobile store. The video showed that the robber carrying the gun was wearing a navy Adidas jacket and glasses. Gov't Hr'g Ex. 4a. A picture of the robber taken from the surveillance video was included in the police bulletin. Gov't Hr'g Ex. 5 at 1.

1

On October 23, 2018, five days after the Boost Mobile robbery, a man robbed a second cell phone store, a MetroPCS store, on the same block as the Boost Mobile store. N.K., the manager of the MetroPCS store, witnessed this robbery. N.K. described the robber as a black man who weighed approximately 150 pounds wearing "[a] blue Adidas jacket, blue pants, [and a] dark bandana on [his] face." Hr'g Tr. 20-21. N.K. told the police the robber was armed. Gov't Hr'g Ex. 3. He also told the police he saw the robber take off his mask and flee down Fifth Street in the direction of Lehigh Street. *Id.*; Hr'g Tr. 148, 150-51; *see also* Gov't Hr'g Ex. 1 (map). Both cell phone stores were on Fifth Street between Summerset and Lehigh streets. *Id.*; Hr'g Tr. 35-36.

While MetroPCS did not have security footage of the robbery, the police collected security videos from three nearby buildings: a gas station, a grocery store, and a housing complex. Hr'g Tr. 25, 82-83. The gas station is on the corner of Fifth and Lehigh, which is the direction N.K. saw the robber flee. Hr'g Tr. 18; Gov't Hr'g Ex. 3. The grocery store is on the corner of Summerset Street, one block north of the MetroPCS store, and Reese Street, one block west. Hr'g Tr. 35; Gov't Hr'g Ex. 1. The housing complex is on Summerset Street and Eighth Street, a few blocks west of the MetroPCS store. Hr'g Tr. 31; Gov't Hr'g Ex. 1.

The police believed videos from these three locations showed the robber both going to the MetroPCS store and leaving from the MetroPCS store.[1] The videos show a black man wearing a navy Adidas jacket, a backpack, and dark pants with white stripes. Gov't Hr'g Ex. 4b. The cameras first capture the man walking east past the housing complex on Eighth and Summerset. *Id.* at 0:14-0:31. Next, they show the man turning south on Reese street near the grocery store. *Id.* at 0:35-

---

[1] Carter disputes whether the person in the video is the robber. The Court need not decide whether the person in the video was the robber. The Court need only decide whether the police *reasonably believed* the person in the video was the robber. As explained in the discussion section below, the Court finds the police reasonably believed the person in the video was the robber.

0:46. Then they show the man using an alley near the gas station to go from Reese Street to the block on Fifth Street with the MetroPCS store. *Id.* 1:11-1:30. A short time later, the cameras capture what appears to be the same man running away from the direction of the MetroPCS store. *Id.* at 6:05. He runs toward Lehigh Street but turns west into the alley near the gas station. *Id.* He runs through the alley to Reese Street. *Id.* at 6:11-6:18. Finally, he is captured running north on Reese Street and turning West onto Summerset Street near the grocery store. *Id.* at 6:32-6:43. These videos suggest the robber came from and fled to a location northwest of the cell phone store.

Three days after the MetroPCS robbery, on October 26, 2018, Police Officer Thomas Bellon saw Carter on Cambria Street near Thirteenth Street. Hr'g Tr. 53. This was less than a mile away, or about a fifteen-minute walk, from where the robberies occurred. Def's Mot. to Suppress Ex. C.; Gov't Hr'g Ex. 1. It was also about four to eight blocks west and a couple blocks north of the housing complex where Officer Bellon had recovered the video of the man he believed to be the robber. *Id.*; Hr'g Tr. 52. Thirteenth and Cambria was also a high crime area. Hr'g Tr. 51, 57. When Officer Bellon saw Carter, he was wearing a navy Adidas jacket, black Adidas pants with white stripes, black sneakers, and glasses. Gov't Hr'g Ex. 7.

When he noticed Carter, Officer Bellon suspected Carter might be the person who robbed the cell phone stores. Officer Bellon was the officer who had initially responded to the MetroPCS robbery and spoken to the witness, N.K. Hr'g Tr. 19-20. Officer Bellon was also the Officer who initially found and watched the security footage from the three buildings near the MetroPCS store.[2]

---

[2] Carter argues Officer Bellon's testimony on this point is not credible. According to Carter, the report Officer Bellon filed after he stopped Carter undermines Officer Bellon's testimony because it only mentions the video from the housing complex. Hr'g Tr. 98. Therefore, Carter argues, Officer Bellon must have only seen this one video. The Court finds all of Officer Bellon's testimony credible, including his testimony on this point. Officer Bellon credibly explained that he included the housing complex video in the report because he had recovered it himself, and he did not include other videos in the report because he merely viewed those videos and flagged them

Hr'g Tr. 27-30. He explained that the versions of the videos he saw when he went to each of these three locations were clearer than the videos presented to the Court at the suppression hearing. Hr'g Tr. 55-57. In the clearer version of the videos, Officer Bellon could see that the man in the video was wearing glasses. *Id.* In addition to watching these videos and getting a description from N.K., Officer Bellon also saw the police bulletin from the earlier robbery of the Boost Mobile store. Hr'g Tr. 45-46. This bulletin had a description and a picture of the men who robbed the Boost Mobile store. Gov't Hr'g Ex. 5.

When he spotted Carter, Officer Bellon and his partner Officer Rosa followed Carter into a small convenience store. Both Officers filmed their subsequent interaction with Carter on their body cameras. Video from the Officers' cameras shows Carter with his hands in his pockets when the Officers approached him. Gov't Hr'g Ex. 6 at 0:40-0:47; Gov't Hr'g Ex. 7 at 0:41-47. It also shows Carter turning to his side when he sees the officers. *Id.* (both cites). The Officers handcuffed Carter almost immediately. Gov't Hr'g Ex. 6 at 0:48-1:07. Soon after the Officers approached Carter, he asked them why they were singling him out, but the Officers told him they would explain later. *Id.* at 0:44-1:53. While the Officers were patting him down, he asked "[are] you all looking for somebody or something? Do I fit a description or something?" *Id.* at 1:30-1:34.

After the Officers frisked Carter, they asked him his name. Carter gave the Officers the fake name of James or "Jimmy" Smith. *Id.* at 2:29-2:34, 4:34-4:39. The Officers asked if Carter had any ID and he told them he had left his ID at home. *Id.* at 2:36-2:40. While the Officers were speaking with Carter, they called for backup. The Officers had been on foot, so they did not have

---

for the detectives to recover later. Hr'g Tr. 101-02. Officer Bellon also testified extensively regarding his experience locating and viewing the videos at all three locations. *See generally* Hr'g Tr. 26-45 (Officer Bellon's direct testimony about the videos). In addition, nothing in Officer Bellon's report indicates the housing video is the only video available. *See generally* Gov't Hr'g Ex. 8 (the report).

4

a police car. Hr'g Tr. 64-65. The backup officers had a police car with a Mobile Data Terminal. This Terminal lets the police look up a person's arrest record, and it also shows if a person has an I.D., like a driver's license. Hr'g Tr. 65. About six minutes after the officers began talking to Carter, they moved him to the police car. Gov't Hr'g Ex. 6 at 6:57-7:08. Once Carter was in the car, Officer Rosa used the Terminal to look up the name and birthday Carter provided. Hr'g Tr. 66. Officer Rosa found no records for a James Smith with the birthday Carter gave him. *Id.* This meant that either "James Smith" had no arrests and no I.D. or "James Smith" was a fake name.

After the Officers could not identify Carter using the Terminal, the Officers decided to bring Carter to the police station. The backup officers took Carter to the station, which was about a five-minute drive from the store where they found Carter. Hr'g Tr. 70. On the ride to the station, Carter told the police officers he had lied about his name and he had an outstanding warrant. Hr'g Tr. 67. When they were at the station, the police discovered Carter's real name and found his outstanding warrant. Gov't Hr'g Ex. 10 at 3. They then transferred him to the Kintock Center, a detention facility. *Id.* at 3-4.

After finding Carter, the police continued to investigate the robberies. They got a warrant to search Carter's room at the Kintock Center. *Id.* During their search of his room, they recovered the clothing he was wearing when he was arrested. Def's Mot. to Suppress Ex. A at 4. They also searched his last known address, which was a house owned by his ex-girlfriend, B.W. While that search did not turn up any evidence, B.W. later came to the police station with some of Carter's belongings. Those belongings included a package for a BB gun designed to look like a handgun. Gov't Hr'g Ex. 15 at 7. The package was addressed to Carter and it was sent on September 19, 2018, about a month before the robberies. *Id.*

The police also used Carter's picture in a photo array that they showed one witness at each of the two robberies. Gov't Hr'g Ex. 10 at 3. While the Boost Mobile witness could not identify anyone in the photo lineup, N.K., the MetroPCS witness, identified Carter. *Id.* Detective Dinezza, who was not involved in the investigation and did not know who the suspect was, administered the photo array shown to N.K. *Id.*; *see also* Hr'g Tr. 125. Detective Dinezza showed N.K. each of the pictures in the photo array one by one. Hr'g Tr. 127-28. He then showed N.K. each picture a second time and asked if N.K. recognized each picture. *Id.* N.K. said he recognized Carter's picture and he was 75% sure Carter was the robber. Gov't Hr'g Ex. 11 at 2. He later told police he "definitely chose the right guy . . . but that the picture was a little bit older." Gov't Hr'g Ex. 13 at 1. The picture was actually taken in October 2017, a year before the robberies. Gov't Hr'g Ex. 10 at 4.

On January 31, 2019, the Government filed an indictment charging Carter with two counts of robbery. After he was indicted, Carter moved to suppress the statements he made to the police, the clothing taken from his room, the box from the BB gun, and N.K.'s identification of him as the robber. The Court issued an Order denying Carter's motion on November 25, 2019. This memorandum explains the Court's reasons for denying Carter's Motion.

**DISCUSSION**

Carter makes three arguments in favor of suppressing the evidence against him. First, he argues the police violated the Fourth Amendment when they seized him at the convenience store. Second, he argues his statements to police should be suppressed because he was not given *Miranda* warnings. Third, he argues the photo array shown to the witnesses was unfair. The Court holds: (1) the officers did not violate the Fourth Amendment when they seized Carter; (2) Carter's statements to the police should not be suppressed because the statements were not part of a police

interrogation; and (3) Carter's picture was not unfairly singled out in the photo array.[3] The Court therefore denies Carter's motion to suppress.

   A. **Carter's Seizure**

The police had reasonable suspicion to stop Carter when they approached him in the convenience store, and this stop was not a de facto arrest.

The Fourth Amendment prohibits unreasonable seizures, but the police may seize or arrest a suspect if they do so reasonably. Police may seize and detain a suspect for a brief *Terry* stop when they have reasonable suspicion the suspect "was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 229 (1985). The police can also arrest a suspect when they have probable cause to believe "that an offense has been or is being committed by the person to be arrested." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016). With limited exceptions, when the police violate the Fourth Amendment, the Court must suppress the evidence they later uncover as "fruit of the poisonous tree." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).

The Court will address Carter's seizure in three steps. First, the Court will determine whether Carter's encounter with police was a *Terry* stop or a de facto arrest. Second, the Court will decide whether the police had the appropriate degree of suspicion to support this seizure. Third, the Court will discuss whether the evidence later collected by the police must be suppressed under the "fruit of the poisonous tree" doctrine.

The Officer's stop of Carter was a *Terry* stop and not a de facto arrest. While there can be "difficult line-drawing problems in distinguishing an investigative stop from a de facto arrest," the

---

[3] In his brief, Carter argued that the search warrant the police used to search his home contained material misstatements and omissions. During the suppression hearing, Carter withdrew this portion of his motion. Hr'g Tr. 114, 120-21. The Court will therefore not address this argument.

touchstone is whether the defendant is detained longer than necessary for the police to conduct their investigation. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). In other words, a *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *accord Sharpe*, 470 U.S. at 682 (quoting *Terry*).

Carter argues his stop was a de facto arrest because he was handcuffed, put in a police car, and transported to the police station. The Court finds none of these elements transformed the *Terry* stop into a de facto arrest because the Officers acted reasonably and diligently in conducting their investigation.

The Officers reasonably handcuffed Carter as part of the *Terry* stop. The Third Circuit has held that handcuffing a defendant does not turn a *Terry* stop into an arrest. *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010) ("Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid *Terry* stop into a full-blown arrest."). In *Johnson*, the Third Circuit explained that handcuffing a defendant during a *Terry* stop is appropriate when the police do so "to ensure that the scene [i]s secure." *Id.*

Here, Officers handcuffed Carter to secure the scene and preserve officer safety as part of the *Terry* stop. The Officers had reason to believe Carter carried a weapon when they handcuffed him. At the time, they thought Carter had committed two armed robberies. When they approached Carter, he had his hands in his pockets while turning one side away from them. Their suspicion that Carter was an armed robber combined with Carter's behavior convinced the police Carter might have a weapon. Because the Officers reasonably handcuffed Carter for their safety as part of the *Terry* stop, this action did not turn the stop into an arrest. *Johnson*, 592 F.3d at 448.

Similarly, the Officers' decision to put Carter in the police car did not transform the stop into an arrest. During a *Terry* stop, it is permissible for the police to take reasonable steps to determine a suspect's identity and to secure the situation. The Supreme Court has explained that police have "the ability to briefly stop that person [the suspect], ask questions, or check identification in the absence of probable cause." *United States v. Hensley*, 469 U.S. 221, 229 (1985); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, *in order to determine his identity* or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (emphasis added)). In *Terry*, the Supreme Court emphasized that police may take reasonable steps to prevent violence during an investigative stop. *Terry* 392 U.S. at 24 (1968) ("[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. . . . [It is] clearly unreasonable to deny the officer[s] the power to take necessary measures . . . to neutralize the threat of physical harm.").

The Officers' decision to put Carter in the police car was permissible as part of their efforts investigate Carter's identity and to secure the area. The police car had the Mobile Data Terminal, which was the best way to check Carter's identity. Hr'g Tr. 65-66. Since Officer Rosa had to be in the front seat of the car to use the terminal, it was reasonable for the Officers to put Carter in the back seat. This way, Officer Rosa could easily ask Carter for the information Officer Rosa needed to look up the name "James Smith" in the Terminal. The police officers were also worried about their safety. While they had already frisked Carter for weapons, there were a number of pedestrians on the sidewalk who could have interfered with the police encounter. Gov't Hr'g Ex. 6 at 7:00-8:04; Hr'g Tr. 105. Officer Bellon credibly testified that, because of his previous experiences in

9

this neighborhood, he feared a confrontation on the street could cause bystanders to become unruly or violent. Hr'g Tr. 57-58. The Officers reasonably thought placing Carter in the car, instead of talking to him on the sidewalk, would minimize the risk that these nearby bystanders would intervene. Putting Carter in the police car was therefore a reasonable method to both investigate his identity and avoid possible harm to police officers.

The Officer's decision to take Carter to the police station also did not elevate the stop into an arrest. Transporting a defendant a short distance for identification purposes is not outside the scope of a *Terry* stop. *United States v. Foster*, 891 F.3d 93, 107 (3d Cir. 2018) (explaining that it was not unreasonable as part of a *Terry* stop "to transport [the defendant] the very short distance back to Branmar Plaza [so a police officer could identify him].").

The Officers reasonably transported Carter for five minutes to the police station to learn his identity.[4] The Officers suspected James "Jimmy" Smith was a fake name, but they needed to bring Carter to the station to confirm their suspicions. Carter argues that the police had no reason to suspect he was lying to them about his name. The Court disagrees. The police had a reason to be suspicious when no "James Smith" came up in the Mobile Data Terminal. There were only two ways to explain why this name did not come up. The first explanation was "James Smith" had never gotten any form of ID and never had any previous encounters with the police. The second explanation was "James Smith" was a fake name. Since Carter had told the police earlier that he

---

[4] Carter argues that the Officers did not bring Carter to the station to learn his identity, but instead to investigate the robberies. The Court finds the Officers were interested in determining Carter's identity, not questioning him about the robberies. Hr'g Tr. 66-67. There is no evidence that police ever questioned Carter about the robbery or that they intended to hold him for longer than it took to discover his identity. *See Id.* (Officer Bellon's testimony that he would have let Carter go as soon as he discovered Carter's real identity if Carter had not had an outstanding warrant). While the police may have intended to use Carter's identity in order to further their investigation of the robberies, discovering a suspect's identity is a permissible goal of a *Terry* stop. *See Adams*, 407 U.S. at 146 (it is often reasonable to use a *Terry* stop to determine a defendant's identity).

10

had an ID which he left at home, the Officers could rule out the first explanation. The Officers' suspicions were then confirmed when, on the way to the station, Carter told police he had lied about his name.[5]

Finally, the Court notes that the amount of time Carter spent detained did not turn his stop into an arrest. There is no bright-line rule regarding the length of time a defendant can be held during a *Terry* stop. *Sharpe*, 470 U.S. at 685 (1985) ("[O]ur cases impose no rigid time limitation on *Terry* stops . . . Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."). Instead, a stop is permissible under *Terry* when "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686.

Carter was detained for less than twenty minutes before he told police he was lying about his name and he had an outstanding warrant. The officers held Carter for about thirteen minutes before sending him to the police station. Gov't Hr'g Ex. 6. They spent about six of the thirteen minutes waiting for backup. *Id.* This was a reasonable method of pursuing their investigation because they needed access to a police car with a Mobile Data Terminal to verify Carter's identity. They could only gain this access by calling for backup because they were on foot. After backup arrived, the Officers looked up Carter's false name in the Terminal. This was also a reasonable

---

[5] At this point the police had probable cause to arrest Carter for lying to a police officer about his identity, 18 Pa. Con. Stat. § 4914, and based on the outstanding warrant. Therefore, the Court need not explore whether Carter's subsequent detention in the station escalated into an arrest. *Cf. Sharpe*, 470 U.S. at 684 n. 4 (explaining that a defendant was arrested when "(1) the defendant was taken from a private dwelling; (2) he was transported unwillingly to the police station; and (3) he there was subjected to custodial interrogation resulting in a confession.") The Court also notes that Carter did not argue he was de facto arrested because of his treatment at the station; his argument about a de facto arrest focuses on the Officer's behavior before he arrived at the station.

method of trying to obtain Carter's identity. Only when this method failed did the Officers decide to transport Carter to the station, which was a five-minute drive away. Hr'g Tr. 70. In fact, the police would not have had to keep Carter longer than the time it took to put his name in the Terminal if Carter had not given a false name. Hr'g Tr. 66-67. The fact that Carter contributed to the delay weighs in favor of concluding that the stop did not escalate to an arrest. *See Sharpe*, 470 U.S. at 688 ("We reject the contention that a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains.").

Because the Court concludes the Officers executed a *Terry* stop, the Court will next address whether they had reasonable suspicion to do so. The Court holds that Officer Bellon had reasonable suspicion to stop Carter. A reasonable suspicion is a suspicion "grounded in specific and articulable facts." *Hensley*, 469 U.S. at 229. The Supreme Court has explained, "reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). However, a reasonable suspicion must be "more than more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 124.

In this case, Officer Bellon based his suspicion on at least five factors: (1) the videos he watched; (2) his discussion with N.K.; (3) the police bulletin he read; (4) his observations of Carter; and (5) Carter's location. These five factors combined were more than enough to justify the *Terry* stop. The Court will address each factor in turn.

First, Officer Bellon had seen video from three different locations of the person who he believed robbed the MetroPCS store. Carter argues that it was not reasonable for Officer Bellon to rely on this video because the video may not have depicted the robber. The Court finds it was reasonable for Officer Bellon to believe the video depicted the robber for several reasons: The

12

video depicted a person who was the same race and gender as the robber, wearing the same jacket as the robber, and wearing a backpack like the robber. The person in the video was walking towards the store that was robbed and, a few minutes later, running away from the store that was robbed. He was also running in the same direction the witness saw the robber flee. In addition, this video was taken around the time of the robbery from buildings near the robbery. While it is possible that two people with similar descriptions walked toward, and then ran away from, the MetroPCS store around the same time, it was reasonable for Officer Bellon to believe the person he saw in the video was the robber.

Second, Officer Bellon relied on the description he got from N.K. Information from a witness gives rise to reasonable suspicion when that information is reliable. *United States v. Brown*, 448 F.3d 239, 249 (3d Cir. 2006) ("[T]he Supreme Court has made clear that an informant's veracity, reliability, and basis of knowledge ... [are] highly relevant in determining the value of his report." (internal quotations omitted; second and third alterations in original)). Information is more reliable when it comes from a person who witnessed the crime. *Id.* at 249–50 (information is more reliable when "[t]he person providing the information has recently witnessed the alleged criminal activity"). In addition, information "given face to face is more reliable than [information given during] an anonymous telephone call." *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000). In this case, N.K. witnessed the robbery of the MetroPCS store shortly before speaking face to face with Officer Bellon. N.K.'s information was therefore a reliable basis for Officer Bellon's reasonable suspicion.

Third, Officer Bellon relied on the police bulletin from the earlier Boost Mobile robbery. The police may use a bulletin prepared by other officers as the basis for a *Terry* stop. In other words, "if a flyer or bulletin has been issued on the basis of articulable facts supporting a

reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification." *Hensley*, 469 U.S. at 232. Here, the bulletin was based on eye witness accounts from a Boost Mobile store employee and the security footage from the store.

Carter does not challenge the validity of the information in the bulletin regarding the Boost Mobile robbery. Instead, he argues the police should not have concluded that the man who robbed the MetroPCS store was one of the men who robbed the Boost Mobile store. The Court finds it was reasonable for the police to connect the two robberies: The two stores were on the same block and robbed within days of one another. After both robberies, the robbers were seen fleeing in roughly the same direction, and both robberies were committed by a person wearing the same jacket. While the Court notes it is possible that a second person wearing a navy Adidas jacket decided to commit a similar robbery on the same block and flee in the same direction, the Court finds that it was reasonable for the police to believe these two robberies were committed by the same person.

Fourth, Officer Bellon observed Carter and saw that Carter looked like the robber. "The fact that every detail provided [in a description] matched the details observed by the officers can contribute to a finding of reasonable suspicion." *Brown*, 448 F.3d at 247 (internal quotations omitted; alterations in original). An officer does not have reasonable suspicion, however, when a defendant merely matches "an excessively general description." *Id.* at 252.

Carter matched a sufficiently detailed description here. Carter was wearing a navy Adidas jacket, which was mentioned in N.K.'s description and visible in both the picture on the police bulletin and the videos Officer Bellon watched. He was also wearing striped pants which were visible in the videos and mentioned in the police bulletin. He was wearing black sneakers which

fit the description from the bulletin. He was also wearing glasses, which matched what Officer Bellon saw in the video. In addition to his outfit, Officer Bellon recognized Carter's face from the video. Hr'g Tr. 106-07.

Carter argues that he did not fit the description of the robber because he was wearing different clothes. Carter notes he was wearing glasses, but none of the witnesses' descriptions of the robber mentioned glasses. Officer Bellon testified, however, that the man in the video he watched was wearing glasses. The Court finds this testimony credible and notes that video from the Boost Mobile robbery also shows the robber wearing glasses. Carter next argues that N.K. said the robber was wearing blue pants, but, when police arrested Carter, he was wearing black pants with stripes. While this is a discrepancy, the Court does not think it undermines the Officers' reasonable suspicion. The videos and the other witness description confirm the robber was wearing black pants with white stripes. Carter also argues he was wearing a different hat than the robber. The Court agrees but finds that this distinction is not dispositive. Because Carter was arrested several days after the last robbery, the police could consider that he may have changed hats.

Carter also argues he did not fit the description because of his age. Witnesses described the robber as someone in his 20s whereas Carter was 41. This distinction is not material in this case. Officer Bellon did not need to rely on witness descriptions of the robber's age because he saw several videos of the man he believed to be the robber, and, in those videos, Officer Bellon could see the robber's face. If there had been no video, the discrepancies Carter notes may have undermined Officer Bellon's reasonable suspicion. In light of the video, however, the Court finds Carter's appearance substantially matched the detailed descriptions available to Officer Bellon. [6]

---

[6] Carter also argues that he did not have the same facial hair as a description provided by one witness to a detective, but Officer Bellon did not see that description. The witness Officer Bellon spoke to, N.K., did not describe the robber's facial hair. Hr'g Tr. 82.

Fifth, Officer Bellon considered Carter's location when he stopped him. When a court considers whether police officers had reasonable suspicion, one factor is "the geographical and temporal proximity of the stop to the scene of the alleged crime." *United States v. Goodrich*, 450 F.3d 552, 561 (3d Cir. 2006). Carter was stopped less than a mile, or about a fifteen-minute walk, from where the robberies occurred. He was northwest of the two cell phone stores, which was the direction the robber fled after both robberies. He was also only a few blocks away from the housing complex where Officer Bellon found the video which he believed depicted the robber.

In sum, the Court concludes that Officer Bellon had reasonable suspicion to stop Carter because Officer Bellon recognized Carter from the videos, N.K.'s description, and the police bulletin, and because Carter was in an area where Officer Bellon reasonably suspected the robber might be. Because Officer Bellon had reasonable suspicion to stop Carter, Carter was not unlawfully seized.

Since Carter's seizure was constitutional, the evidence the police collected should not be suppressed under the fruit of the poisonous tree doctrine. The Court briefly notes, however, that the valid state warrant in this case would likely be an intervening event which would prevent the suppression of evidence the police found after they discovered the warrant. *See Utah v. Strieff*, 136 S. Ct. 2056 (2016) ("The outstanding arrest warrant for [the defendant's] arrest is a critical intervening circumstance that is wholly independent of the illegal stop. The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence.")

**B. Carter's Statements to Police**

Carter's statements to the police should not be suppressed because the police did not violate his right against self-incrimination. A defendant must be warned of his right against self-incrimination and his right to an attorney before he can be interrogated by police. *Miranda v.*

*Arizona*, 384 U.S. 436, 444, (1966). Police need not give *Miranda* warnings, however, when they are not interrogating a suspect. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) ("[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.") A suspect is interrogated when the police either ask questions or engage in other behavior that they "should know [is] reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

Here, none of Carter's statements should be suppressed under *Miranda*. While Carter's Motion to Suppress is not clear about which statements Carter believes should be suppressed, the Court will consider two statements mentioned in the motion: Carter's statement to police asking if he met a description and Carter's statement that his name was James or "Jimmy" Smith.

Carter's statement about fitting a description was not a response to any police questioning or other behavior designed to get Carter to reveal incriminating information. In fact, before Carter made that statement the police had not asked him any questions or done anything to indicate they wanted to hear from him. It was Carter who began asking the Officers questions, and the Officers responded to Carter's questions by assuring him they would tell him more later. The Officers statements to Carter indicated they did not want to talk to him about the reason he was stopped. Carter's voluntary statement about fitting a description should therefore not be suppressed. *See Miranda*, 384 U.S. at 478 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.").

While Carter's statement that his name was James Smith was in response to a question from police, this question is not subject to *Miranda*. In *Pennsylvania v. Muniz*, the Supreme Court held that "routine booking question[s]" such as a defendant's "name, address, height, weight, eye color, date of birth, and current age" are exempt from *Miranda* warnings. 496 U.S. 582, 601

(1990). This exception applies to questions "reasonably related to the police's administrative concerns." *Id.* at 601-02; *accord Maryland v. King*, 569 U.S. 435, 456 (2013) (summarizing the holding in *Muniz*). Here, the Officers' request for Carter's name is an administrative question. Carter's answer is therefore not suppressible because he was not given *Miranda* warnings.

### C. The Photo Array

The photo array presented to the witnesses was not unduly suggestive. A defendant's due process rights are violated when "an identification procedure is so suggestive that it undermines the reliability of the resulting identification." *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003). A photo array is unduly suggestive "when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who an identifying witness should select." *Id.* The defendant bears the burden of showing that the array was unduly suggestive. *Id.*

Here, the police took at least three steps to ensure the photo array would be impartial. First, they used a double-blind procedure in which the detective who administered the photo array did not know the identity of the suspect. *See, e.g.*, *United States v. Caraballo*, 643 F. App'x 163, 170 (3d Cir. 2016) (noting that the "double-blind procedure is highly recommended for reducing the risk of improper law enforcement suggestion"). Second, they showed the witnesses one picture at a time. Third, they chose six people for the photo array who looked like one another. *See United States v. Burnett*, 773 F.3d 122, 133 (3d Cir. 2014) (holding that a photo array was not unduly suggestive when "all of the men in the array were of a similar age; there was no striking difference in the amount of head hair each had; and the skin color of the members of the array was not strikingly different.")

According to Carter, these steps were not enough. He argues he stood out in the photo array because he was wearing a distinctive shirt. The Court disagrees. While it is possible that a person may stand out in a photo array if his photo is distinctive, shirt color is not typically an indication of an unduly suggestive photo array. *See, e.g.*, *United States v. Dowling*, 855 F.2d 114, 117 (3d Cir. 1988), *aff'd* 493 U.S. 342 (1990) (rejecting the defendant's argument that a photo array was unduly suggestive because he was the only person in the array wearing a red shirt). Each of the photos in the array at issue here contains a man in a unique shirt. Gov't Hr'g Ex. 11 at 4-10. While Carter's shirt is the only one with a plaid pattern, not all of the other shirts are one solid color. *Id.* Also, the shirts are barely visible in each of the photos because the photos are taken from the neck up. *Id.* In addition, the witnesses never had a chance to compare the photos side-by-side, so they would be less likely to notice any difference in Carter's shirt pattern. Hr'g Tr. 130.

**CONCLUSION**

The police did not violate any of Carter's constitutional rights: they stopped Carter based on reasonable suspicion; they were not required to give Carter *Miranda* warnings before asking him his name; and they did not present an unduly suggestive line up. The Court therefore denies Carter's motion to suppress.